# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ILLINOIS POWER GENERATING COMPANY, ) | |
| ) | |
| *Petitioner,* ) | **PETITION TO VACATE** |
| v. ) | **ARBITRATION AWARD** |
| ) | |
| ADVATECH, LLC, ) | |
| ) | Civil Action No. 19-642 |
| *Respondent.* ) | |
| ) | |
| _____ ) | |

Petitioner Illinois Power Generating Company ("IPGC" or "Petitioner"), by its undersigned attorneys, as and for its Petition to Vacate Arbitration Award, alleges as follows:

## NATURE OF THE ACTION

1.     This is a proceeding under the Federal Arbitration Act, 9 U.S.C. §§ 1-16. Petitioner applies, pursuant to 9 U.S.C. § 10, for an order vacating the Interim Award dated March 25, 2019 ("Interim Award") and the Final Award dated June 12, 2019 (the "Final Award" and collectively with the Interim Award, the "Award"), rendered in an arbitration under the auspices of the American Arbitration Association ("AAA") in the matter of an arbitration between Advatech, LLC (as Claimant) and IPGC (as Respondent), under AAA Case No. 01-17-0001-5690 (the "Arbitration") on the grounds that the arbitrators exceeded their authority by: (i) excising the operative contract language that limited the scope of the termination payment; (ii) disregarding language limiting demobilization payments to costs and instead awarding costs and profit (at a unilaterally determined profit margin); and (iii) awarding expert witness fees and expenses that the parties did not agree to submit for arbitration.

1

2.     The Arbitration arose out of a construction project and concerned the interpretation of a contract between IPGC and Advatech dated December 15, 2014, known as the Second Amended and Restated Newton FGD System Engineering, Procurement, Construction and Commissioning Services Contract or the "Fixed Price Contract."  True and correct copies of the Interim Award and of the Final Award are attached as Exhibit A and Exhibit B to the declaration of Susan L. Grace filed contemporaneously herewith (the "Grace Declaration").[1]  A true and correct copy of the Fixed Price Contract is attached to the Grace Declaration as Exhibit C.

## THE PARTIES

3.     Petitioner IPGC is a company organized and existing under the laws of Illinois with its principal place of business in Texas.

4.     Respondent Advatech is a limited liability company organized and existing under the laws of Delaware.  Advatech has two members: (i) Mitsubishi Heavy Industries America, Inc., a Delaware corporation with its principal place of business in New York; and (ii) URS Corporation, a Nevada Corporation with its principal place of business in California.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1332 because the matter in controversy (i) exceeds the sum or value of $75,000.00 (the Award ordered IPGC to pay in excess of $34 million) and (ii) is between citizens of different States.

---

[1] All citations to Exhibits or "Exh." refer to the exhibits to the Declaration of Susan L. Grace, filed herewith.

AMERICAS 100129906

6.      This Court has personal jurisdiction over Respondent Advatech by virtue of its agreement to arbitrate all disputes under the Fixed Price Contract in Illinois.  (*See* Exh. C at § 21.3)

7.      Venue is proper in this District pursuant to 9 U.S.C. § 9 because the Award was made in Newton, Illinois, and pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as described further below.

## ALLEGATIONS OF FACT

### A.      The Project

8.      Advatech was hired in 2011 by Ameren Energy Generating Company ("AEGC") to construct a wet flu gas desulfurization system, known as a "scrubber" (the "Project"), at AEGC's coal fired power plant in Newton, Illinois (the "Plant").  The Project was initially expected to be completed in 2015.

9.      By 2012, the long-term viability of the Plant and continuation of the Project had been called into question due to a sustained slump in power prices.  On March 1, 2012, AEGC decelerated Advatech's work on the Project.

10.     The price slump continued for the remainder of the year and, in March 2013, Ameren announced that, rather than continue the Project, it planned to sell AEGC (and the Plant) to Dynegy, Inc. (the "Ameren Transaction").

11.     The Ameren Transaction closed in December 2013 and AECG's name was changed to IPGC.  The new management team then began discussions with Advatech about restarting the Project.

### B.      The Fixed Price Contract

3

12.     On or about December 15, 2014, IPGC and Advatech executed the Fixed Price Contract to govern the remainder of the Project.  (*See* Exh. C)

### 1.     <u>Payment Schedule</u>

13.     To control the cash spend on the troubled Project, the Fixed Price Contract provided for a payment schedule.  Exhibit I-1 set forth defined annual cash spends ("<u>Annual Payment Amounts</u>").  The Annual Payment Amounts total to $204,306,063 and are set forth in Exhibit I-1 of the Fixed Price Contract as follows:

| | |
|---|---|
| 2015 | $18,000,000 |
| 2016 | $28,700,000 |
| 2017 | $26,700,000 |
| 2018 | $68,450,000 |
| 2019 | $60,656,063 |
| 2020 | $1,800,000 |

(Exh. C at Ex. I-1)  The cash spends were purposely back-loaded—with the majority of the amounts allocated to 2018 and 2019—to provide IPGC substantial time to assess the Project.

14.     The parties agreed that the Annual Payment Amounts would be further divided into monthly scheduled payments reflecting the work to be performed in each month.  Realizing that it was unrealistic to schedule the remaining work on a month-by-month basis years in advance, however, the parties instead agreed that, in October of the preceding year, Advatech would propose to IPGC monthly payments reflective of the Work scheduled to be done in each month of the next calendar year.   Section 10.12 of the Fixed Price Contract ("<u>Payment</u>

4

Schedule") provides for the preparation each year of a payment schedule to be tied to the work to be performed:

> 10.12  **Payment Schedule**. On or before October 31 of each year, Contractor shall submit to Owner a proposed Payment Schedule for the next calendar year that divides the amount to be paid by Owner in the next calendar year as set forth in Exhibit I-1 into <u>monthly payments that reflect the Work scheduled to be done in each month of the next calendar year as set forth in the Baseline Schedule</u>. Owner shall provide any written notice of objection to such proposal on or before the later to occur of November 15, or the 15th day after receipt of the proposed Payment Schedule, provided, <u>Owner's right to object to a proposed Payment Schedule shall be limited to (a) the failure of the monthly payments reflected in the Payment Schedule to reflect the Work scheduled to be done in each month</u>, and (b) the aggregate of the monthly payments in a calendar year not equaling the annual payment for such year set forth in Exhibit I-1 . . . .

(Exh. C at § 10.12 (emphasis added))

## 2.    **Termination for Convenience**

15.    The Fixed Price Contract also expressly allowed IPGC to terminate the Project at its convenience without a penalty.  (*See* Exh. C at § 25.4.1.1)  Section 25.5 provides that, upon termination by IPGC for convenience, Advatech was entitled to a termination payment equal to the sum of:

> 25.5.1.1 The cost of the Work performed based on the percent complete of the Project <u>from the last scheduled payment to the date of termination</u>, less all prior payments.

> [and]

> 25.5.1.2 All <u>reasonable, actual, direct costs</u> incurred by Contractor as a result of Owner's request for termination, including, without limitation, reasonable, actual, direct <u>costs</u> incurred by Contractor in terminating Subcontracts and its operations.

(Exh. C at §§ 25.5.1.1 and 25.5.1.2 (emphasis added))

## C.    **Performance and Termination of the Fixed Price Contract**

16.    In the first year of performance of the Fixed Price Contract, 2015, Advatech performed the work as planned and received full payment for its work—the Annual Payment

5

Amount of $18 million as provided by Exhibit I-1 to the Fixed Price Contract, paid in monthly installments in accordance with the agreed payment schedule.  The power market remained depressed, however, and IPGC's cash position continued to suffer.  IPGC began to consider the idea of substantially slowing down the Project in order to conserve cash while it assessed the Project's viability.

17.     On September 2, 2016, IPGC exercised its right to terminate the Fixed Price Contract for convenience.

18.     IPGC understood that, because Section 25.5.1.1 of the Fixed Price Contract provides for a termination payment covering only the period of time "from the last scheduled payment to the date of termination," the termination payment would be limited to work performed in the first two days of September (i.e., the two days "from the last scheduled payment to the date of termination" on September 2, 2016 before IPGC terminated the contract).

19.     On September 30, 2016, however, Advatech submitted its final invoice for the Project ("Final Invoice") and claimed a termination payment in the amount of $80.7 million. Advatech's Final Invoice also included $693,424 for demobilization costs, for a total of $81,423,990.  (*See* Exh. D)

20.     Although Advatech did not explain the rationale for its claimed termination payment at the time, it was revealed during the Arbitration that Advatech calculated its Final Invoice based on: (i) a work period from the outset of the Project in 2011 (rather than from the effective date of the Fixed Price Contract); and (ii) an alleged "Percent Complete" for the entire Project (rather than "from the last scheduled payment to the date of termination," as provided for in the Fixed Price Contract).

### D.     The Arbitration

6

21.     On March 15, 2017, Advatech commenced arbitration against IPGC under Section 21.3 of the Fixed Price Contract (Exh. C at § 21.3) by filing a Demand for Arbitration with the AAA, alleging breach of the Fixed Price Contract and seeking damages in the amount of $81,423,900.

22.     A panel of three arbitrators (the "<u>Tribunal</u>") was appointed by the AAA to hear the dispute.

23.     A preliminary case management hearing was held in Washington, DC on June 22, 2017.  Following that hearing, on July 31, 2017, the Tribunal issued Scheduling and Procedural Order No. 1, which set forth the procedural rules and schedule for the remainder of the proceedings.  (*See* Exh. E)

24.     In accordance with those rules and schedule, prior to the evidentiary hearing, the parties submitted fact witness statements, rebuttal witness statements, expert reports, and rebuttal expert reports.  These submissions were submitted as evidence and, accordingly, Scheduling and Procedural Order No 1. Provided that the parties' direct examination of their respective fact and expert witnesses at the hearing would be "limited."  Scheduling and Procedural Order No. 1 also provided that "[d]ocuments, issues, witnesses, or testimony not disclosed in accordance with this Order shall be excluded from evidence, except for compelling reasons."  (Exh. E at § 23)

25.     The evidentiary hearing was held in October 2018 in Chicago, Illinois.

26.     At 6 p.m. on September 30, 2018, the Sunday night before the hearing commenced, Advatech submitted a new report by its corporate representative and fact witness, Greg Smith.  Though submitted under the guise of a demonstrative, the report was a full-fledged rebuttal report of IPGC's expert, Frank Regnery.

AMERICAS 100129906

27.     When IPGC objected that the report was untimely under Scheduling and Procedural Order No. 1., the Tribunal's Chairman swiftly dismissed IPGC complaints concerning Advatech's trial by ambush, warning IPGC's Counsel: "Whether [Mr. Smith] testifies directly from the exhibit or we permit him to look at his notes, he's going to get this in. You know that." (Exh. N at 245:18-21) (He then added that, under the Federal Arbitration Act, "Arbitrators don't get criticized for allowing evidence; they get criticized for not allowing evidence" (Exh. N at 246:8-13) (thereby acknowledging that the alleged demonstrative— effectively a rebuttal report—was indeed being admitted as evidence that could not be properly contested.)  The Chairman not only allowed Mr. Smith's belated rebuttal report; he also allowed Mr. Smith to testify a second time on the last day of the hearing (after IPGC had presented its case), so that he could rebut IPGC's evidence, including the testimony of its expert witness. Following Mr. Smith's second round of direct testimony, IPGC was allowed only three minutes for cross examination.

28.     In addition to allowing extemporaneous evidence and testimony that was contrary to the agreed procedures, the Panel repeatedly hampered IPGC's examination of Advatech's witnesses.  For example, the Chairman warned Mr. Smith that IPGC's Counsel was "asking a leading question" (on cross examination) advising him to "answer it in any way [Mr. Smith thought] was responsive." (Exh. N at 318/23-319/1)  Just a few minutes later, the Chairman characterized one of IPGC's Counsel questions as "frankly . . . misleading." (Exh. N at 337/8-10)  The Chairman then criticized IPGC's use of a deposition transcript to impeach Mr. Smith because Mr. Smith had subsequently changed his testimony via an errata sheet.  While IPGC's question was eventually allowed, the Chairman stated incorrectly that the question was "just perpetuating an error." (Exh. N at 505/2-6)

8

E.     **The Interim Award**

29.     On March 25, 2019, the Tribunal issued an Interim Award in Advatech's favor. (Exh. A)  Ignoring the contract language limiting the scope of the termination payment to the work performed "from the last scheduled payment to the date of termination," the Tribunal awarded a termination payment in the amount of $36,835,273.  The Tribunal also awarded $77,895 in unilaterally determined profits on Advatech's demobilization costs, disregarding the contract language limiting the payment to reimbursement for costs only.  As a result, the Interim Award ordered IPGC to pay damages in the amount of $36,913,168 ($36,835,273 for the termination payment and $77,895 for demobilization costs), plus pre- and post-award interest. (*See* Exh. A at 43)

F.     **Advatech's Fee Petition**

30.     The Tribunal further stated in the Interim Award, that it would "entertain a petition from Advatech for recovery of its attorneys' fees and expenses, expert fees and expenses, AAA fees, arbitrator compensation and expenses, and any other fees or expenses attendant to the arbitration," and that "IPGC will have an opportunity to object and respond to Advatech's request," at a time that would be established by a separate order of the Tribunal. (Exh. A at 42)

31.     On April 2, 2019, the Tribunal issued a Scheduling and Procedural Order Governing Fee and Cost Submissions.  (*See* Exh. F (Scheduling and Procedural Order Governing Fee and Cost Submissions))

32.     On April 19, 2019, Advatech submitted a Petition for Arbitration Fees and Expenses ("Fee Petition"), requesting, *inter alia*, attorneys' fees and expenses, expert witness

9

fees and expenses, fact witness fees, and other expenses incurred in connection with the dispute in the total amount of $4,413,748.67.  (*See* Exh. G)

33.     IPGC filed a response to Advatech's Fee Petition on May 3, 2019, arguing, *inter alia*, that the Tribunal lacked authority to award the witness fees and certain other expenses sought by Advatech in its Fee Petition.  (*See* Exh. H)

**G.     The Final Award**

34.     On June 12, 2019, the Tribunal entered a Final Award, awarding Advatech an additional $4,079,804.24 for its attorneys' fees and expenses, expert witness fees and expenses, and e-discovery consultant fees and expenses.  (*See* Exh. B)

**CLAIMS FOR RELIEF**

35.     Petitioner repeats and realleges paragraphs 1 through 34 above as if fully set forth herein.

36.     Petitioner brought this action within the three month period provided under 9 U.S.C. § 10, during which the parties may seek to vacate or modify the Award.

37.     Pursuant to 9 U.S.C. § 10(a), the Court may make an order vacating the award upon the application of any party to the arbitration:

(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

10

9 U.S.C. § 10(a).[2]

38.     The United States Supreme Court has set forth the applicable standard of review

for arbitration awards as follows:

> An arbitrator is confined to interpretation and application of the [contract]; he
> does not sit to dispense his own brand of industrial justice. He may of course look
> for guidance from many sources, yet his award is legitimate only so long as it
> draws its essence from the [contract]. When the arbitrator's words manifest an
> infidelity to this obligation, courts have no choice but to refuse enforcement of the
> award.

*United Steelworkers* v. *Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

39.     The Seventh Circuit has confirmed:

> Judicial deference to arbitration, however, is not unlimited. "[A]n arbitrator is
> confined to interpretation and application of the . . . agreement; he does not sit to
> dispense his own brand of industrial justice." *Enter. Wheel & Car Corp.*, 363 U.S.
> at 597 (1960). "When the arbitrator's words manifest an infidelity to this
> obligation, courts have no choice but to refuse enforcement of the award." *Id.* A
> court is empowered to vacate an arbitrator's award if "the arbitrator had exceeded
> the powers delegated to him by the parties." *Dexter Axle Co.* v. *Int'l Ass'n of
> Machinists*, 418 F.3d 762, 768 (7th Cir. 2005) (citing *Enter. Wheel & Car Corp.*,
> 363 U.S. at 597 and *Ethyl Corp.* v. *United Steelworkers of Am.*, 768 F.2d 180, 184
> (7th Cir. 1985)). Because the arbitrator is typically limited to interpreting the
> contract, if "there is no possible interpretive route to the award," then a
> "noncontractual basis can be inferred and the award set aside." *Chicago
> Typographical Union No. 16* v. *Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505-06
> (7th Cir. 1991).

*United States Soccer Fed'n, Inc.* v. *United States Nat'l Soccer Team Players Ass'n*, 838 F.3d

826, 832 (7th Cir. 2016).

40.     Arbitrators do not have power to disregard contract terms.  *See Bankers Life &

Cas. Ins. Co.* v. *CBRE, Inc.*, 830 F.3d 729, 732 (7th Cir. 2016) ("[B]ecause 'arbitrators' authority

is limited by the unambiguous contract language,' they 'do not have the authority to ignore the

---

[2] The Illinois Uniform Arbitration Act likewise provides that the Court "shall vacate an award where . . . the
arbitrators exceeded their powers."  710 ILCS 5/12(a)(3).

AMERICAS 100129906

plain language of the contract and to alter the agreement, as the ultimate award must be grounded on the parties' contract.'") (quoting *First Merit Realty Services, Inc.* v. *Amberly Square Apartments, L.P.*, 869 N.E.2d 394, 399 (Ill. App. Ct. 2007)); *Spencer* v. *Ryland Grp., Inc.*, 865 N.E.2d 301, 304 (Ill. App. Ct. 2007) (an arbitrator "does not have authority to ignore the plain language of the contract or to interpret unambiguous contract language."); *Shearson Lehman Bros.* v. *Hedrich*, 639 N.E.2d 228, 233 (Ill. App. Ct. 1994) (arbitrators lack authority to "ignore[] the unambiguous contract language and implement[] their own notion of what would be reasonable and fair.").

41.     As set forth below, the Tribunal exceeded its powers by: (i) ignoring the plain language of the Fixed Price Contract, which limits the termination payment to the time period "from the last scheduled payment to the date of termination;" (ii) disregarding contract language that limits demobilization payments to "costs" and awarding Advatech additional, unilaterally-determind profit on its demobilization work; and (iii) awarding witness fees and other expenses that the parties did not submit to the Tribunal for determination.

## COUNT ONE – VACATUR OF THE AWARD

42.     Petitioner repeats and realleges paragraphs 1 through 41 above as if fully set forth herein.

43.     The Tribunal exceeded its authority by disregarding the operative language in the Fixed Price Contract limiting the scope of work covered by the termination payment.

44.     As set forth above, the Fixed Price Contract provided for a termination payment equal to "the cost of the Work performed based on the percent complete of the Project <u>from the last scheduled payment to the date of termination</u>, less all prior payments."  (Exh. C at § 25.5.1.1 (emphasis added))  The words "from the last scheduled payment to the date of termination" are

unambiguous.  In fact, Advatech admitted at the hearing that the "from . . . to" language is a common device used to identify a start point and an end point for measurement.  (*See* Exh. M at 998/4-999/12)  Arbitrators lack the authority to disregard such clear and unambiguous terms in the parties' agreement.  Nevertheless, here, the arbitrators did just that.

45.     As set forth above, the Fixed Price Contract provides that the termination payment shall be equal to:

> The cost of the Work performed based on the percent complete of the Project from the last scheduled payment to the date of termination, less all prior payments.

(Exh. C at § 25.5.1.1)

46.     To award a termination payment in the amount of $36,835,273, the Tribunal used the following calculation:

> **[(cost to IPGC of remaining Work) *multiplied by* (% complete of remaining Project at termination)] *less* (payments under Contract) *EQUALS* Termination Payment**

(Exh. A at 21 (emphasis in original))

47.     This formula ignores the operative language from Section 25.5.1.1 and substitutes in new language to accomplish what the arbitrators subjectively deemed appropriate.  Specifically, the Tribunal's formula deletes the operative time period for payment, "from the last scheduled payment to the date of termination" (Exh. C at § 25.5.1.1), and instead calculates the termination payment based on the work performed from the effective date of the Fixed Price Contract to termination.  (*See* Exh. A at 21)

48.     The Tribunal's "interpretation" of Section 25.5.1.1 is illustrated as follows:

> The cost of the Work under the Fixed Price Contract performed based on multiplied by the percent complete of the Project at termination from the last scheduled payment to the date of termination, less all prior payments.

(Compare Exh. C at § 25.5.1.1 with Exh. A at 21)

AMERICAS 100129906

49.     In the Interim Award, the Tribunal explained that the phrase "percent complete of the Project" is "reasonably and logically interpreted to mean the percent complete of the Work remaining to be performed after the Effective Date of the [Fixed Price Contract]."  (Exh. A at 26) The Tribunal failed, however, to offer any explanation for the remainder of the sentence— "percent complete of the project from the last scheduled payment to the date of termination"— and simply omitted it.  (*See id.* at 23-26, 29)  Omitting contract language exceeds the arbitrators' authority.  *See, e.g.*, *Clinchfield Coal Co.* v. *Dist. 28, United Mine Workers & Local Union # 1452*, 720 F.2d 1365, 1369 (4th Cir. 1983) ("Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract."); *George A. Hormel & Co.* v. *United Food & Commercial Workers, Local 9*, 879 F.2d 347, 351 (8th Cir. 1989) ("[W]here a decision does not account for essential clauses and does not give a reason for the failure to mention essential clauses, the award has been vacated because such shortcomings are an indication that the arbitrator has not interpreted the specific contract at issue."); *PMA Capital Ins. Co.* v. *Platinum Underwriters Berm., LTD.*, 659 F. Supp. 2d 631, 639 (E.D. Pa. 2009), *aff'd*, 400 F. App'x 654 (3d Cir. 2010) (vacating arbitration award because the arbitrators' decision effectively "eliminate[d] material provisions of the contract they are charged with interpreting"); *Sonic Auto., Inc.* v. *Price*, No. 3:10-cv-382, 2011 U.S. Dist. LEXIS 90359, at *43, *47 (W.D.N.C. Aug. 12, 2011) (vacating an arbitration award because the arbitrator "refuse[d] to apply some contractual terms but not others" and "wrote a material term out of the contract and in so doing, went beyond the scope of his authority").

50.     The Tribunal points to the fact that IPGC paid Advatech $33,333.33 for the 2 days of work performed from the last scheduled payment to the date of termination on September 2,

14

2016 (calculated based on the percentage of days worked in September multiplied by the total payment scheduled for that month), and rejects that as an "interpretation" of Section 25.5.1.1 because the panel—without citing any evidence or authority—stated  it "is highly unusual and is not a method that reasonable persons would normally and customarily use to determine the termination payment in the context of a fixed price contract."  (Exh. A at 24-25)  This reasoning fails for at least two reasons.

51.     *First*, the language "from the last scheduled payment to the date of termination" is unambiguous.   Arbitrators cannot reject plain and unambiguous contract language simply because it provides for something that is not usual or customary.  *See, e.g.*, *Tootsie Roll Indus., Inc.* v. *Local Union No. 1*, 832 F.2d 81, 84 (7th Cir. 1987) ("While reliance on [past practices] is appropriate to interpret ambiguous contract terms, . . . [it] cannot be relied upon to modify clear and unambiguous provisions."); *Judsen Rubber Works* v. *Mfg., Prod. & Serv. Workers Union Local No. 24*, 889 F. Supp. 1057, 1064 (N.D. Ill. 1995) (vacating arbitration award because "the arbitrator looked to past practice not to interpret the terms of the contract, but rather, in spite of the terms of the contract" and stating, "[t]he key, as we read the Seventh Circuit opinions, is that reliance on past practice is proper where it is in the service of interpreting the contract rather than serving as a mechanism to rewrite a contract based on the arbitrator's sense of industrial fairness"); *Timken Co.* v. *United Steelworkers of Am.*, 482 F.2d 1012, 1015 n.2 (6th Cir. 1973) ("It is axiomatic that if the arbitrator undertook to, in effect, amend the contract, to substitute his own discretion for that of the parties or to dispense 'his own brand of industrial justice,' the enforcement of the award must be denied.").

52.     That is particularly true where, as here, the Tribunal's "interpretation" was specifically what was rejected during contract negotiations.  *See Tootsie Roll Indus., Inc.*, 832

AMERICAS 100129906

F.2d at 84 (holding that arbitrator exceeded its authority by disregarding unambiguous language that was "a deliberate modification" to the parties' prior agreement). It is undisputed that IPGC added "from the last scheduled payment" to the Fixed Price Contract during negotiations and that Advatech accepted the language. (*See* Exh. J (Draft of the Fixed Price Contract dated September 19, 2014) at IPGC0000001526) The fact that the Tribunal has chosen to ignore (rather than interpret) this language is underscored by the fact that the Tribunal's "interpretation" is exactly how Section 25.5.1.1 would read had IPGC never added the language:

> 25.5.1.1       The cost of the Work performed based on the percent complete of the Project ~~from the last scheduled payment~~ to the date of termination, less all prior payments.

(*See* Exh. C at § 25.5.1.1) In other words, by ignoring the language "from the last scheduled payment" and basing the award on the "cost of the Work performed based on the percent Complete of the Project to the date of termination," the Tribunal (without authority) restored to the contract a meaning that the parties had specifically rejected during the contract negotiations. *See Patten* v. *Signator Ins. Agency, Inc.*, 441 F.3d 230, 236 (4th Cir. 2006) (holding that arbitrator exceeded its authority where it "appear[ed] to have revised the governing arbitration agreement on the basis of his own 'personal notions of right and wrong,' and imposed a [term] on the parties that they had specifically rejected"); *Sonic Auto., Inc.*, 2011 U.S. Dist. LEXIS 90359, at *44 ("By effectively striking paragraph two from the [Contract], the Arbitrator structured the arbitration agreement as he—not the parties—saw fit."); *see also Industrial Commodity Corp.* v. *E. J. Brach & Sons*, 92 Ill. App. 2d 163, 167 (1968) (rejecting interpretation of a termination clause that "treat[ed] as surplusage the phrase 'in the second and subsequent years,'" and stating "it is assumed that everything in a contract is inserted deliberately and for a purpose").

16

53.     **Second**, IPGC never offered this as an "interpretation" of Section 25.5.1.1. Instead, as the Tribunal acknowledged, IPGC used the percentage of days worked in September as a proxy for the percent completed from the last scheduled payment to the date of termination because Advatech did not supply information for IPGC to determine the actual percent of the Project completed during those days.  (*See* Exh. A (Interim Award) at 24; *see also* Exh. I (IPGC Pre-Hearing Memorandum) at 25)

54.     In an attempt to portray its decision as if it interpreted the language in Section 25.5.1.1, the Tribunal repeatedly cites the principle that "to the extent a contract is susceptible of two interpretations, . . . the interpretation which makes a rational and probable agreement must be preferred."  (Exh. A at 24)   But, the Tribunal never offers an alternative interpretation of "from the last scheduled payment to the date of termination."  It simply omits that language from its interpretation entirely.

55.     In fact, even in the section of the Interim Award where the Tribunal purports to interpret the phrase "percent complete of the Project from the last scheduled payment to the date of termination," the Tribunal omits the second half of the sentence from its conclusion and interprets only the phrase "percent complete of the Project":

> Therefore, "percent complete of the Project," in our view and based upon the evidence presented, refers to the percentage completed as of termination of the remaining Work to be performed under the Contract, . . . which yields a reasonable and logical interpretation of Section 25.5.1.1.

(Exh. A at 26; *see also id.* at 29 (summarizing the Tribunal's interpretation  of Section 25.5.1.1 and omitting the phrase "from the last scheduled payment to the date of termination"))   The Tribunal's failure to give any meaning to the key operative words "from the last scheduled payment to the date of termination" demonstrates that the Award is not based on an interpretation of the contract language, but rather on omission of it.  *See Judsen Rubber Works*,

17

889 F. Supp. at 1064 (vacating arbitration award where the "arbitrator's Award and Opinion is silent on the meaning or significance of [certain] provisions regarding overtime").

56.     The Tribunal therefore exceeded its authority by excising the operative contract language and the Award must be vacated in its entirety.

### COUNT TWO – VACATUR OF THE AWARD TO THE EXTENT THE TRIBUNAL AWARDED UNILATERALLY DETERMINED PROFITS ON ADVATECH'S DEMOBILIZATION COSTS

57.     Petitioner repeats and realleges paragraphs 1 through 56 above as if fully set forth herein.

58.     The Tribunal also exceeded its authority by awarding Advatech $77,895 for demobilization costs.

59.     Section 25.5.1.2 of the Fixed Price Contract required payment only for "reasonable, actual, direct" demobilization "costs."  (Exh. C at § 25.5.1.2)

60.     Ignoring this unambiguous language, the Tribunal made a new agreement and awarded additional "profit" that was unilaterally determined by Advatech as "15% markup on its demobilization costs."  (Exh. A at 8)  Specifically, the Tribunal stated that "Advatech's overhead and *profit* on demobilization work constitute recoverable *costs*" under Section 25.5.1.2.  (Exh. A. at 8 (emphasis added))

61.     The Tribunal does not have authority to disregard unambiguous contract language under the guise of interpretation.  By awarding Advatech additional profit under clear contract language that only provides for actual and direct *costs*, the Tribunal exceeded its authority. Accordingly, the Tribunal's award of $77,895 for demobilization costs must be vacated.

18

## COUNT THREE – VACATUR OF THE AWARD TO THE EXTENT THE TRIBUNAL AWARDED IMPERMISSIBLE EXPERT WITNESSFEES AND EXPENSES

62.     Petitioner repeats and realleges paragraphs 1 through 61 above as if fully set forth herein.

63.     The parties agreed to arbitrate pursuant to the AAA's Construction Industry Arbitration Rules (the "AAA Rules").  A true and correct copy of the AAA Rules is attached to the Grace Declaration as Exhibit M.

64.     AAA Rule 48 provides that, "[i]n the final award, the arbitrator shall assess fees, expenses, and compensation as provided in Sections R-55, R-56, and R-57.  The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate."  (Exh. M at R-48(c))  Additionally, the award "may include . . . an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."  (*Id.* at R-48(d)(ii))

65.     The Fixed Price Contract (i.e., the parties' arbitration agreement) is silent regarding attorneys' fees and the Tribunal is authorized to award attorneys' fees solely because both parties requested an award of attorneys' fees during the hearing.  A portion of the hearing transcript reflecting the parties' respective requests for attorneys' fees is attached to the Grace Declaration as Exhibit N.

66.     The authority conferred by R-48 is not unlimited, however, and it does not extend to certain fees and expenses that Advatech requested and the Tribunal awarded.  Specifically, as set forth below, the Tribunal lacked authority to award Advatech's expert witness fees and expenses, which comprise $1,328,787.55 of the Award.  (*See* Exh. B at 10)

67.     AAA Rule 56 provides the following regarding witness fees and expenses:

> ***The expenses of witnesses for either side shall be paid by the party producing such witnesses.*** All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

(Exh. M at R-56 (emphasis added))

68.     The first sentence of Rule 56 specifically excludes a party's own witness expenses from the amounts that may be apportioned by the arbitrator under R-48.  Accordingly, the Tribunal had no authority under the AAA Rules to award Advatech its expert witness fees and expenses.[3]

69.     The Tribunal also lacked any authority to award expert witness fees and expenses under the guise of an attorneys' fees award.  As set forth above, the sole basis for the Tribunal's authority to award attorneys' fees is the provision in AAA Rule 48(d)(ii) that authorizes an "award of attorneys' fees if all parties have requested such an award."  (Exh. M at R-48)  There is no similar provision concerning witness fees and expenses and, even if there was, neither party requested an award of witness fees or expenses at any time prior to or during the hearing.[4]

---

[3] The AAA Rules would not permit an award of a party's own witness expenses even if Rule 56 did not expressly exclude such expenses.  Like Rules 55 and 57, which are limited to the narrow categories of AAA administrative fees and arbitrator compensation, the "expenses of the arbitration" contemplated by R-56 are limited to expenses that are to be "borne equally by the parties" absent apportionment in the final award.  (Exh. M at R-56)  As the fees and expenses of a party's own witness would not otherwise be split equally between the parties, such fees and expenses would not be apportionable under Rules 48 and 56 even absent the express exclusion in Rule56.  The fact that the Rules do expressly exclude such expenses only makes even more abundantly clear that the Tribunal lacked authority to include them in the Final Award.

[4] The distinction between attorneys' fees and expert witness fees is well recognized.  *See, e.g.*, 42 U.S.C. § 1988(b) and (c) (distinguishing between an award of attorneys' fees and expert fees); *Amara* v. *CIGNA Corp.*, No. 3:01-CV-2361 (JBA), 2018 U.S. Dist. LEXIS 202717, at *15 (D. Conn. Nov. 29, 2018) (noting that § 1988 was amended "to expressly provide for the award of expert fees" because, without that provision, the statute's authorization of attorneys' fees did not permit an award of expert fees); *BASF Corp.* v. *Old World Trading Co.*, 839 F. Supp. 528, 532 (N.D. Ill. 1993) (holding that the Lanham Act did not provide for recovery of expert witness fees because the relevant provision "allows for the shifting of attorneys' fees but makes no mention of expert witness fees").  Accordingly, it cannot be said that any request for attorneys' fees implicitly includes a request for expert fees.  Moreover, any such argument would be contrary to established Illinois law that "[p]arties are only bound to arbitrate those issues which by clear language they have agreed to arbitrate; arbitration agreements will not be extended by

70.    Further, the question of expert witness fees was raised during the hearing after the parties both confirmed that they were requesting attorneys' fees, but neither Advatech nor IPGC indicated that it would seek expert fees.  (*See* Exh. N at 1229/16-17)  To the contrary, counsel for IPGC stated that it could not agree to something "outside the agreed-to contract or the rules that otherwise govern the AAA" without consulting with its client.  (*See id.* at 1230/11-15)  As the relevant AAA Rule is limited to attorneys' fees—and does not include expert witness fees—there was no basis for the Tribunal to award expert witness fees and expenses, and the award of such fees and expenses in the amount of $1,328,787.55 must be vacated.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Petitioner IPGC respectfully requests that the Court:

1.    Enter an order vacating the Award in the entirety pursuant to 9 U.S.C. § 10;

2.    In the alternative, enter an order vacating the Award pursuant to 9 U.S.C. § 10 to the extent that the Tribunal awarded $77,895 in unilaterally determined profit on Advatech's demobilization costs; and

3.    Enter an order vacating the Award to the extent that it awards $1,328,787.55 for impermissible expert witness fees and expenses.

---

construction or implication."  *Flood* v. *Country Mutual Ins. Co.*, 242 N.E.2d 149, 151 (Ill. 1968), *accord Lee B. Sten & Co.* v. *Zimmerman*, 660 N.E.2d 170, 173 (Ill. App. Ct. 1995) (holding that "arbitrators exceeded their powers" by awarding attorneys' fees based on a rule that permitted the arbitrators to assess "arbitration fees"); *see also TruServ Corp.* v. *Ernst & Young*, 876 N.E.2d 77, 85 (Ill. App. Ct. 2007) (vacating arbitration award of expert witness fees because "the supreme court [of Illinois] has held that the fees charged by expert witnesses are not recoverable under statutory provisions that permit a prevailing party to recover costs").

21

Dated: June 12, 2019

WEBBER & THIES, P.C.

By: _s/ John E. Thies_____

John E. Thies
Attorney No. 6199338
Daniel R. Thies
Attorney No. 6304141
202 Lincoln Square
Urbana, IL 61801
Tel. (217) 367-1126
Fax (217) 367-3752
jthies@webberthies.com

WHITE & CASE LLP
Glenn M. Kurtz (*pro hac vice* motion to be filed)
Susan L. Grace (*pro hac vice* motion to be filed)
1221 Avenue of the Americas
New York, New York 10020
Tel. (212) 819-8200
gkurtz@whitecase.com
susan.grace@whitecase.com

*Counsel for Illinois Power Generating Company*